Joseph P. Loughlin
Law Offices of M.L. Zager, P.C.
30 North St. Suite 3, PO Box 948
Monticello NY 12701
jloughlin@mzager.com
Fax: 845-794-3919
Tel: 845-794-3660

Attorneys for Plaintiff
G & G Closed Circuit Events, LLC

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| G & G Closed Circuit Events, LLC<br><br>      Plaintiff,<br><br>  vs.<br><br>Torri Clayton, individually and d/b/a Cheri's Bedstuy LLC and Cheri's Bedstuy LLC d/b/a Cheri's BedStuy<br><br>      Defendants. | Case No.:<br><br>**COMPLAINT** 1:24-cv-4191 |

**PLAINTIFF ALLEGES:**

**JURISDICTION**

1. Jurisdiction is founded on the existence of a question arising under particular statutes. This action is brought pursuant to several federal statutes, including the Communications Act of 1934, as amended, Title 47 U.S.C. 605, *et seq*., and The Cable & Television Consumer Protection and Competition Act of 1992, as amended, Title 47 U.S. Section 553, *et seq*.

2. This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. Section 1331, which states that the District Courts shall have original jurisdiction of all civil actions

arising under the Constitution, laws, or treaties, of the United States.

3. This Court has personal jurisdiction over the parties in this action as a result of the Defendants' wrongful acts hereinafter complained of which violated the Plaintiff's rights as the exclusive commercial domestic distributor of the televised fight *Program* hereinafter set forth at length. The Defendants' wrongful acts consisted of the interception, reception, publication, divulgence, display, and exhibition of said property of Plaintiff within the control of the Plaintiff in the State of New York.

## **VENUE AND INTRADISTRICT ASSIGNMENT**

4. Venue in this Court is proper under 28 U.S.C. §1391 as a substantial part of the Programs or omissions giving rise to the claims herein occurred in this District.

5. Assignment to the Eastern District of New York is proper because a substantial part of the Programs or omissions giving rise to the claim occurred in Kings County and/or the United States District Court for the Eastern District of New York has decided that suits of this nature, and each of them, are to be heard by the Courts in this particular Division.

## **THE PARTIES**

6. Plaintiff, G & G Closed Circuit Events, LLC is, and at all relevant times hereto was, a California corporation with its principal place of business located at 2925 Green Valley Parkway, Suite D, Henderson, NV 89014.

7. Cheri's Bedstuy LLC, an unknown business entity d/b/a Cheri's Bedstuy (hereinafter "Cheri's Bedstuy LLC"), at all times relevant hereto, was a Domestic Limited Liability Company organized and existing under the laws of the State of New York.

8. At all times relevant hereto, Cheri's Bedstuy LLC was an owner, and/or operator, and/or licensee, and/or permittee, and/or person in charge, and/or an entity with dominion, control,

oversight and management of the commercial establishment doing business as Cheri's Bedstuy operating at 216 Malcolm X Boulevard Brooklyn NY 11221.

9. At all times relevant hereto, Defendant Torri Clayton, individually and d/b/a Cheri's Bedstuy was identified as an Owner and Principal of Cheri's Bedstuy LLC, which owned and operated the commercial establishment doing business as Cheri's Bedstuy operating at 216 Malcolm X Boulevard Brooklyn NY 11221.

10. At all times relevant hereto, Defendant Torri Clayton was identified by the New York State Liquor Authority as the Principal of Cheri's Bedstuy LLC on the New York State Liquor Authority License for Cheri's Bedstuy LLC (License Serial No. 1343545), for the commercial establishment Cheri's Bedstuy operating at 216 Malcolm X Boulevard Brooklyn NY 11221.

11. At all times relevant hereto, Defendant Torri Clayton was the sole individual identified on the On Premises Liquor License (License Serial No. 1343545) issued to Cheri's Bedstuy LLC. for the commercial establishment Cheri's Bedstuy operating at 216 Malcolm X Boulevard Brooklyn NY 11221.

12. Plaintiff is informed and believes, and alleges thereon that on Saturday, May 28, 2022 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19) Defendant, Torri Clayton as the Owner and Principal of Cheri's Bedstuy LLC., and as the sole individual identified on the On Premises Liquor License (License Serial No. 1343545) for Cheri's Bedstuy LLC. had the right and ability to supervise the activities of Cheri's Bedstuy, which included the unlawful interception, receipt and publication of Plaintiff's *Program*.

13. Plaintiff is informed and believes and alleges thereon that on May 28, 2022 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19), Defendants, Torri Clayton, as the Owner and Principal of Cheri's Bedstuy LLC. and as the sole individual identified

on the On Premises Liquor License (License Serial No. 1343545) for Cheri's Bedstuy LLC had the obligation to supervise the activities of Cheri's Bedstuy operating at 216 Malcolm X Boulevard Brooklyn NY 11221, which included the unlawful interception, receipt and publication of Plaintiff's *Program*.

14. Plaintiff is informed and believes, and alleges thereon that on Saturday, May 28, 2022 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19), Defendant Torri Clayton specifically directed the employees of Cheri's Bedstuy to unlawfully intercept, receive and broadcast Plaintiff's *Program* at Cheri's Bedstuy or intentionally intercepted, and/or published the *Program* at Cheri's Bedstuy herself. The actions of the employees of Cheri's Bedstuy are imputable to Defendant Torri Clayton by virtue of her acknowledged responsibility for the operation of Cheri's Bedstuy.

15. Plaintiff is informed and believes, and alleges thereon that on Saturday, May 28, 2022 (the night of the *Program* at issue herein, as more specifically defined in Paragraph 19), Defendant Torri Clayton was the Owner and Principal of Cheri's Bedstuy LLC. and as the sole individual identified on the On Premises Liquor License (License Serial No. 1343545) for Cheri's Bedstuy LLC, had an obvious and direct financial interest in the activities of Cheri's Bedstuy operating at 216 Malcolm X Boulevard Brooklyn NY 11221, which included the unlawful interception, receipt and publication of Plaintiff's *Program*

16. Plaintiff is informed and believes, and alleges thereon that the unlawful interception, receipt and publication of Plaintiff's *Program*, as supervised and/or authorized by Defendant Torri Clayton, individually and d/b/a Cheri's BedStuy, resulted in increased profits or financial benefit to Cheri's BedStuy.

17. Plaintiff is informed and believes, and alleges thereon that on Saturday, May 28, 2022,

(the night of the *Program* at issue herein, as more specifically defined in Paragraph 19), Defendant, Torri Clayton as the Owner and Principal of Cheri's Bedstuy LLC was a moving and active conscious force behind the operation, advertising and promotion of Cheri's Bedstuy operating at 216 Malcolm X Boulevard Brooklyn NY 11221, and is responsible for all activities that occurred therein, which included the unlawful interception and exhibition of Plaintiff's *Program*.

## **Factual Background**

18. Plaintiff G & G Closed Circuit Events, LLC hereby incorporates by reference all of the allegations contained in paragraphs 1-17, inclusive, as though set forth herein at length.

19. Plaintiff entered into a Multi-Fight Closed Circuit Television License Agreement with PBC on PPV, LLC through which Plaintiff was granted the exclusive nationwide commercial distribution (closed-circuit) rights to the Gervonta Davis v Rolando Romero Lightweight World Championship Fight *Program*, telecast nationwide on May 28, 2022, including undercard or preliminary bouts (the match and all related bouts are collectively referred to as the "*Program*"), at commercial establishments such as theaters, arenas, bars, clubs, lounges, restaurants and the like throughout New York and other geographic locales (the "Multi-Fight Closed Circuit Television License Agreement"). A copy of the Multi-Fight Closed Circuit Television License Agreement is annexed hereto as **Exhibit A**. Plaintiff paid substantial fees for its exclusive rights to exhibit the Program under the Multi-Fight Closed Circuit Television License Agreement.

20. Pursuant to the terms of the Multi-Fight Closed Circuit Television License Agreement, Plaintiff G & G Closed Circuit Events, LLC, entered into subsequent sublicensing agreements with various commercial entities throughout North America, including entities within the State of New

York, by which it granted these entities limited sublicensing rights, specifically the rights to publicly exhibit the Program within their respective commercial establishments.

21. The Program could only be exhibited in a commercial establishment in New York if said establishment was contractually authorized to do so by Plaintiff G & G Closed Circuit Events, LLC.

22. Pursuant to the Multi-Fight Closed Circuit Television License Agreement, G & G Closed Circuit Events, LLC marketed and distributed the closed-circuit rights granted to it. G & G Closed Circuit Events, LLC contracted with various establishments throughout New York and granted to such establishments the right to broadcast the Program in exchange for a fee.

23. As a commercial distributor and licensor of sporting Programs, including the *Program*, Plaintiff G & G Closed Circuit Events, LLC, expended substantial monies marketing, advertising, promoting, administering, and transmitting the *Program* to its commercial customers.

24. The transmission of the *Program* was electronically coded or "scrambled". In order for the signal to be received and telecast clearly, it had to be decoded with electronic decoding equipment. The *Program* originated via satellite uplink and was subsequently re-transmitted to cable systems and satellite companies via satellite signal.

25. If a commercial establishment was authorized by Plaintiff to receive the *Program*, the establishment was provided with the electronic decoding equipment and the satellite coordinates necessary to receive the signal, or the establishment's satellite or cable provider would be notified to unscramble the reception of the *Program* for the establishment, depending upon the establishment's equipment and provider.

26. On May 28, 2022 (the night of the Program at issue herein, as more specifically defined in Paragraph 19), Cheri's Bedstuy broadcast the Program on 1 screen with approximately 11-12

people in attendance.

27. On information and belief, on May 28, 2022 (the night of the Program at issue herein, as more specifically defined in Paragraph 19), Cheri's Bedstuy sold alcoholic and non-alcoholic beverages to its patrons.

28. The commercial fee for an establishment the size of the Cheri's Bedstuy to broadcast the Program lawfully was $600.00. Neither Defendant Torri Clayton, individually nor Cheri's Bedstuy LLC paid such a fee to Plaintiff.

## COUNT I

### (Violation of Title 47 U.S.C. Section 605)

29. Plaintiff G & G Closed Circuit Events, LLC, hereby incorporates by reference all of the allegations contained in paragraphs 1-28, inclusive, as though set forth herein at length.

30. On May 28, 2022, in violation of G & G Closed Circuit Events, LLC's rights and federal law, Defendants intercepted and/or received the satellite communication of the Program at Cheri's Bedstuy. Defendant also divulged and published said communication or assisted in divulging and publishing said communication to patrons within Cheri's Bedstuy.

31. The *Program* was broadcast at Cheri's Bedstuy without the authorization or approval of Plaintiff.

32. With full knowledge that the *Program* was not to be intercepted, received, published, and/or exhibited by commercial entities unauthorized to do so, the above named Defendants, either through direct action or through actions of employees or agents directly imputable to Defendants (as outlined in paragraphs 7-17 above), did unlawfully intercept, receive, publish, and/or exhibit the *Program* at the time of its transmission at the commercial establishment Cheri's Bedstuy, operating at 216 Malcolm X Boulevard Brooklyn NY 11221.

33. Said unauthorized interception, reception, publication, and/or exhibition by the Defendants was done willfully and for purposes of direct and/or indirect commercial advantage and/or private financial gain, as confirmed by, *inter alia*, the broadcasting of the *Program* on 1 televisions screen, and the sale of alcoholic beverages during the broadcast.

34. Title 47 U.S.C. § 605(a), and in particular the second through fourth sentences thereof, prohibits the unauthorized interception, receipt, publication and use of radio communications (which include satellite signals) such as the transmission of the Program for which Plaintiff G & G Closed Circuit Events, LLC, had the distribution rights thereto.

35. By reason of the aforesaid mentioned conduct, the aforementioned Defendants, violated Title 47 U.S.C. § 605(a).

36. By reason of the Defendants' violation of Title 47 U.S.C. § 605(a), Plaintiff G & G Closed Circuit Events, LLC, has the private right of action pursuant to Title 47 U.S.C. § 605.

37. As the result of the aforementioned Defendants' violation of Title 47 U.S.C. § 605(a), and pursuant to said Section 605, Plaintiff G & G Closed Circuit Events, LLC, is entitled to the following from Defendants:

(a) Statutory damages for each violation of in an amount to $10,000 pursuant to Title 47 U.S.C. Section 605(e)(3)(C)(i)(II);

(b) Statutory damages for each willful violation in an amount to $100,000.00 pursuant to Title 47 U.S.C. § 605(e)(3)(C)(ii); and

(c) The recovery of full costs, including reasonable attorneys' fees, pursuant to Title 47 U.S.C. Section 605(e)(3)(B)(iii).

**WHEREFORE, Plaintiff prays for judgment as set forth below.**

## COUNT II

### (Violation of Title 47 U.S.C. Section 553)

38. Plaintiff G & G Closed Circuit Events, LLC hereby incorporates by reference all of the allegations contained in paragraphs 1-37, inclusive, as though set forth herein at length.

39. Title 47 U.S.C. § 553(a) prohibits the unauthorized interception or receipt of programming such as Plaintiff's over a cable system.

40. Upon information and belief, and as an alternative to Count I, on May 28, 2022, in violation of G & G Closed Circuit Events, LLC's rights and federal law, Defendants willfully intercepted and/or received the original communication of the *Program* at Cheri's Bedstuy via a cable system.

41. Said unauthorized interception and reception by the Defendants was done willfully and for purposes of direct and/or indirect commercial advantage and/or private financial gain, as confirmed by, inter alia, the broadcasting of the *Program* on 1 screen, and the sale of alcoholic and non- alcoholic beverages during the broadcast.

42. The unauthorized interception or reception of the Program by the Defendants was prohibited by Title 47 U.S.C. § 553(a).

43. By reason of the aforesaid mentioned conduct, the Defendants violated Title 47 U.S.C. § 553(a).

44. By reason of the Defendants' violation of Title 47 U.S.C. § 553(a), Plaintiff G & G Closed Circuit Events, LLC, has the private right of action pursuant to Title 47 U.S.C. § 553.

45. As the result of Defendants' violation of Title 47 U.S.C. § 553(a), Plaintiff G & G Closed Circuit Events, LLC, is entitled to the following from Defendants:

(a) Statutory damages for each violation in an amount to $10,000.00 pursuant to Title 47

U.S.C. § 553(c)(3)(A)(ii);

(b) Statutory damages for each willful violation in an amount to $50,000.00 pursuant to Title 47 U.S.C. § 553(c)(3)(B);

(c) The recovery of full costs pursuant to Title 47 U.S.C. Section 553 (c)(2)(C); and

(d) In the discretion of this Honorable Court, reasonable attorneys' fees, pursuant to Title 47 U.S.C. Section 553 (c)(2)(C).

**WHEREFORE, Plaintiff prays for judgment as set forth below.**

**As to the First Count:**

1. For statutory damages in the amount of $110,000.00 against the Defendants;

2. For reasonable attorneys' fees as mandated by statute;

3. For all costs of suit, including, but not limited to, filing fees, service of process fees, investigative costs; and

4. For such other and further relief as this Honorable Court may deem just and proper.

**As to the Second Count:**

1. For statutory damages in the amount of $60,000.00 against the Defendants;

2. For reasonable attorneys' fees as may be awarded in the Court's discretion pursuant to statute;

3. For all costs of suit, including, but not limited to, filing fees, service of process fees, investigative costs; and

4. For such other and further relief as this Honorable Court may deem just and proper.

Date:    June 13, 2024

Respectfully submitted,

LAW OFFICES OF M.L. ZAGER, P.C.
By: Joseph P. Loughlin
Attorneys for Plaintiff
G & G Closed Circuit Events, LLC

# Exhibit A

PBC on PPV, LLC
13273 Ventura Boulevard, Suite #208
Studio City, California 91604-1840

April 29, 2022

**VIA EMAIL**
G&G Closed Circuit Events, LLC 
2925 Green Valley Parkway, Suite D
Henderson, Nevada 89014

Attention: Nicolas J. Gagliardi

RE:    MULTI-FIGHT CLOSED-CIRCUIT TELEVISION LICENSE AGREEMENT

Gentlemen:

This will confirm the terms of our agreement whereby PBC on PPV, LLC ("Promoter", or "PBC") hereby grants to G&G Closed Circuit Events, LLC, ("G&G", "You" or "Licensee") the exclusive license to exhibit Promoter's live simultaneous pay-per-view ("PPV") telecasts (the "Telecasts") of the next five (5) PPV events (including, in each case, accompanying undercard matches) commencing with the Gervonta Davis v. Rolando Romero event currently scheduled for May 28, 2022 (each, an "Event" and collectively, the "Events"), only within the **Fifty States of the United States of America, the District of Columbia, the Commonwealth of Puerto Rico, and Canada ( the "Territory"),** only at non-residential locations, including, but not limited to, bars, clubs, lounges, restaurants and the like of a commercial (or non-commercial) nature, each with a fire code occupancy capacity **not to exceed 500 persons per outlet,** located within the Territory. The Exhibition rights granted herein **do not include** any rights to exhibit the Events in Mexico, locations within thirty (30) miles of the sites of each Event, transmissions to hotel guest rooms, in-flight aircraft or other transportation facilities, nor does it include the right to sublicense the Events other than the PPV telecast. Any proposed closed-circuit sublicensing of exhibition of the Events at arenas, racetracks or theaters shall be subject to the prior written approval of Promoter, which approval may be granted or refused in the discretion of Promoter.

1.    **License Fee.** As full and complete compensation for the rights granted to Licensee by Promoter, you shall pay to Promoter the license fee calculated as follows for each Event:

a.    Licensee shall pay a Minimum Financial Guarantee of
If such Event does not include an Errol Spence, Jr. v. Terrance Crawford match, or                                             if such Event does include an Errol Spence, Jr. v. Terrance Crawford match (the "Minimum Financial Guarantee"), pursuant to the provisions of Paragraph 2, below;

Then, for each Event other than an Errol Spence, Jr. v. Terrance Crawford match, the amount of all gross revenues in excess of the first
or, with respect to the Errol Spence, Jr. v. Terrance Crawford match, the amount of all gross revenues in excess of the first                                             (which threshold amount Licensee

1

shall retain in recoupment of the Minimum Financial Guarantee) which Licensee receives from all closed circuit television exhibitions of such Event in the Territory shall be payable as follows:

(i)   The remaining                      of all gross revenues from such Event
      shall be payable to PBC, and        of all gross revenues from such
      Event shall be payable to G&G.

b.   For avoidance of doubt, Licensee shall not license any theaters in the Territory without Promoter's prior written consent. Also, for the avoidance of doubt, no Event shall be crossed with any other Event, and the split of gross revenues in clause (i) above shall be calculated on an Event-by-Event basis, without regard to the results of any other Event.

c.   In the event that you should sublicense an outlet for a fixed lump sum or for a license fee which includes a guaranteed amount which is not exceeded by your share of revenues from that outlet, you shall include in gross revenue hereunder the amount equal to such lump sum or guarantee.

d.   Licensee shall be responsible for all of its local advertising material, such as posters, press kits and slide, including the option to use Event posters to be supplied by PBC or its PPV distributor. All advertising materials shall be subject to Promoter's prior written approval.

e.   The calculation of gross revenues shall not include the amount of any fees or taxes referenced in this Agreement paid or required to be paid hereunder.

f.   Licensee agrees to authorize the exhibition of the Events in locations within thirty (30) miles of the sites of the Events at the sole direction of Promoter. For avoidance of doubt, License Fees shall expressly exclude any and all revenues and monies derived from or relating to the sale or license of the exhibition of the Events at locations within thirty (30) miles of the sites of the Events, all of which shall be paid solely to Promoter or its designee.

2.   **Minimum Financial Guarantee and License Fees Overage Payments.**

a.   As minimum guarantee and non-refundable advance against the License Fee due to Promoter pursuant to Paragraph 1 of this Agreement for the Events, you shall make payment to PBC as follows:

i.   the sum of
     Dollars, not later than May 9, 2022;

ii.  the sum of
     not later than May 27, 2022;

iii. the sum of
     no later than two days before the
     next Event;

iv.  the sum of
     no later than two days before the
     next Event; and

v.   the sum of
     Dollars no later than two days before
     the next Event;

2

provided, however, that if one of the Events is the Errol Spence, Jr. v. Terrance Crawford match, then the amount due before that Event shall be increased by the sum of

b.  Each payment of the Minimum Financial Guarantee amount shall be paid by:

I.  a certified check or bank cashier's check payable to PBC on PPV, LLC in such amount; or

II.  bank wire delivered to:

> Beneficiary: PBC on PPV, LLC
> 13273 Ventura Blvd., Suite 208
> Studio City, CA 91604

c.  Payment of all license fee amounts in excess of the applicable Minimum Financial Guarantee for the Events shall be due and owing PBC from G&G (pursuant to Paragraphs 1(a) and 1(a)(i), above), to Promoter not later than ten (10) business days after the Events.

d.  If an Event is postponed or cancelled after Licensee has made a payment of the Minimum Financial Guarantee pursuant to paragraph 2(a), above, Promoter shall return to Licensee the Minimum Financial Guarantee advancement that Licensee has paid Promoter for that Event within ten (10) calendar days of the formal announcement of the Event's postponement or cancelation. Notwithstanding any such postponement or cancellation, it is the intent of the Parties that this Agreement shall apply to a total of five Events, so that the provisions of paragraph 2(a) concerning the Minimum Financial Guarantee shall apply to the next Event as if the postponed or cancelled Event had not occurred.

3.  **Equipment & Signal Transmission of the Telecast of Event.** You and your sublicensees shall be responsible to obtain, at your or their cost and expenses, either:

a.  Authorization to receive the telecast of the Event through the services of one or more satellite ("DDS") programming providers such as DirecTV or DISH Network, to be selected by you and approved by Promoter in writing in advance; or

b.  Authorization to receive the telecast of the Events through the services of one or more cable programming providers to be selected by you and approved by Promoter in writing in advance; or

c.  Authorization to receive the telecast of the Events through the services of one or more alternate programming providers (such as streaming sites), to be selected by you and approved by Promoter.

d.  You shall not charge activation or signal transmission fees to your sublicensees in excess of such fees charged to You by any programming providers delivering signal transmission of the

telecasts of the Events. Any equipment charges necessary to your sublicensees to receive the Events shall be at Your cost and/or the cost of Your sublicensees.

4.    **Delivery of Signal**

a.    Promoter shall deliver either, as Promoter shall elect in its discretion, (i) the encrypted transmission of the video and audio signal of its telecast of the Event to a domestic satellite or other delivery point from which the signal is capable of being received by DSS and VUBIQUITY, for redistribution to your designated outlets or (ii) by fiber optic cable to a delivery point at which the signal is capable of being received by DSS and VUBIQUITY, for redistribution to your designated outlets. Such delivery to the delivery point shall constitute full and complete discharge of the obligations of Promoter to you hereunder. DSS and VUBIQUITY, if applicable, as the case may be, shall have the responsibility to address and authorize decoders or any other such equipment for your authorized sublicensees, You shall be responsible for all charges for addressing and authorizing your sublicensees, as well as all costs and expenses necessary for the reception of the signal and for the projection at the outlets.

b.    Promoter shall have no responsibility for your signal transmission, equipment, decoder and/or authorization fees, and Promoter shall have no responsibility or liability to you or your sublicensees for any technical failures which may occur in connection with the authorizing of equipment or decoders for your sublicensed closed circuit exhibition outlets or in connection with any retransmission or authorizing by DSS or VUBIQUITY, and in such case, you remain responsible for payment of the License Fee to Promoter.

c.    You shall instruct DSS and VUBIQUITY, if applicable, to provide directly to Promoter, on the first business day after the Event, their complete final sublicense reports which shall indicate the name, address, and city of each sublicensed outlet and the decoder number for each sublicensed outlet.

5.    **Pay-Per-View Exhibitions, Delayed Pay Cable Telecasts and Online Internet Transmissions.**

You acknowledge the Promoter will be licensing the live and delayed cable television, direct broadcast satellite television and digital online internet transmission and exhibitions of the Events in the Territory on a residential pay-per-view basis, with subsequent pay cable delayed telecasts, and that; except for Anti-Piracy Enforcement as specified below, you shall have no interest or participation in such exhibitions or any other exploitation of the Events. Accordingly, Licensee has no right to record, duplicate or copy the Events by any means or to exhibit, reproduce or retransmit the Events or any portion thereof, The Telecast shall be exhibited in its entirety without alterations or changes of any nature, simultaneous with their live broadcasts.

6.    **Anti-Piracy Enforcement**

You and your sublicensees shall use their reasonable best efforts to employ adequate security systems and other measures to prevent theft, pirating, copying, duplication or unauthorized exhibition or transmission of the Event. You shall promptly advise the Promoter of any piracy (i.e., unauthorized use or proposed use) of the Event in the Territory. Licensee shall have the right to commence or settle any claim or litigation arising out of the alleged piracy, improper use or proposed improper use of the Event in the Territory, and it is expressly agreed by the Parties that the sales restrictions on licensing within thirty (30) miles of the site of the Event do not restrict Licensee's rights to police these particular areas for theft and

4

unlawful exhibition of the Event, and prosecute non-residential exhibitors in these particular areas as may be required.

a) Notwithstanding the fact that Licensee has secured the rights from Promoter to sublicense the live PPV telecast of the Events only at non-residential locations within the Territory, Promoter and Licensee agree Licensee shall have the right to identify and prosecute as may be necessary all acts of alleged piracy of the Events, regardless of which particular broadcast and/or means of transmission an alleged unlicensed exhibitor may have utilized to obtain and exhibit the Events, including but not limited to international broadcasts (i.e., SkyTV Mexico), internet streaming, and/or replay on private media. Licensee's right to prosecute piracy regarding such transmissions of the Events shall be limited exclusively to claims against non-residential exhibitors within the Territory and Licensee shall be subject to the additional exclusions set forth above and below regarding Private Showings and any other exclusions subsequently agreed upon by Promoter and Licensee and thereafter memorialized in writing.

b) Licensee shall notify Promoter in writing and/or shall consult with Promoter as may be necessary or beneficial to do so before commencing or settling any such claim or litigation in the Territory. Promoter agrees that Licensee shall be afforded all necessary remedies at law or equity to protect Promoter and Licensee in the prosecution of piracy claims involving the Events. Promoter agrees Licensee may prosecute claims under any federal telecommunication statutes (i.e., Titles 47 U.S.C. §553 and §605), state statutes and common law causes of action that may be applicable and further agrees that Licensee may prosecute claims of alleged piracy under copyright causes of action (i.e., Title 17 U.S.C. §101) and Promoter shall assist Licensee as necessary to support the claims brought forth in copyright by executing the Copyright Assignment Agreement, attached hereto to this Agreement as Exhibit "A".

c) Any damages, whether statutory, compensatory, punitive or otherwise, which Licensee may recover from the theft, piracy, copying, duplication, unauthorized exhibition or transmission of the Events in the Territory, and after payment of reasonable legal fees and disbursements, shall constitute gross revenues from the Events, to be shared by, and distributed to, the Promoter and Licensee as provided in Paragraph 1 of this Agreement. Licensee shall advance all required legal fees and disbursements, subject to recoupment from any applicable recovery, and shall report all expenses, settlements and recoveries to Promoter on a quarterly basis. Your sublicensees shall have no right to commence or settle any claim or litigation arising out of the alleged piracy of the telecasts of the Events without the prior written consent of Promoter.

7.    **Private Showings.** Promoter shall have the right, at its cost and expense and upon written notice to You, to conduct or authorize others to conduct up to ten (10) complementary Private Showings of the telecast of each Event within the Territory, with no admission charge and no advertising or advance publicity for such private showings.

8.    **Attachments.** Annexed to this Agreement as exhibits are the following documents, the terms and conditions of which are incorporated herein as if set forth in their entirety. To the extent that anything set forth in the following documents is inconsistent with the terms of this Agreement, the applicable provisions of this Agreement shall prevail

a.    <u>Closed Circuit Television Sublicense Agreement</u> which you and your sublicensees shall complete and sign with respect to each closed-circuit television outlet you may sublicense. YOU SHALL NOT ENTER INTO ANY SUCH AGREEMENTS WITHOUT FIRST OBTAINING, PRIOR TO THE TELECAST OF THE EVENTS, THE WRITTEN CONSENT AND APPROVAL OF PROMOTER TO THE TERMS THEREOF.

b.    <u>Closed Circuit Television Standard Terms and Conditions</u> which shall apply to this Agreement as well as to the Closed Circuit Television Sublicense Agreement. YOU SHALL ATTACH A COPY OF THE STANDARD TERMS AND CONDITIONS TO EACH SUCH SUBLICENSE AGREEMENT.

c.    <u>Copyright Assignment Agreement</u> SHALL APPLY TO THIS AGREEMENT AND THE CLOSED-CIRCUIT TELEVISION SUBLICENSEE AGREEMENTS, AND IS STRICTLY LIMITED TO THE EVENTS ONLY.

9,    <u>Defaults.</u>

a.    Your failure to deliver the Minimum Financial Guarantee as provided in Paragraph 2 hereof or to pay the license fee as provided in Paragraph 1 hereof or to pay the signal delivery fees or equipment expenses as provided in Paragraph 3 hereof or to comply with any other material term or condition of this Agreement or of the annexed agreements or Standard Terms and Conditions shall permit Promoter, in addition to all of its other rights and remedies, to cancel this Agreement with you at any time without any further liability or obligation to you and to retain all monies paid to Promoter prior to such cancellation. Provided, however, that before Promoter may exercise any remedy with respect to any such default, Promoter must (i) provide Licensee with written notice specifying such default, and (ii) if and to the extent that time reasonably permits prior to an Event, provide Licensee with up to seven (7) days after Licensee's receipt of such default notice within which to cure such default.

b.    If, in violation of the provisions of this Agreement, you or a sublicensee exhibits the Event in an outlet with a fire code occupancy limit in excess of 500 persons (except casino locations), then, in addition to the license fee for such outlet as provided in Paragraph 1, and in addition to and not in limitation of or in lieu of any other rights or remedies Promoter may have under this Agreement, at law or in equity, including, without limitation, Promoter's rights to indemnification hereunder, Licensee shall immediately pay to Promoter an amount equal to the following for each such outlet that violates the aforesaid restriction: the sum of the fire code occupancy capacity of the outlet multiplied by 50% of the face amount of the highest ticket or admission price for the Event at that outlet. You agree that this payment is reasonably calculated to reimburse Promoter for its damages in the event of such violation of this Agreement.

10,    <u>No Packaging with Other Events</u>

You shall not sublicense closed circuit television rights to an Events to exhibitors as part of a package which includes other boxing programs or bouts not included in the Event without the prior written consent of Promoter.

11,    <u>Reports, Collection and Accounting.</u>

a.    You shall be responsible for collection of all monies from outlets, shall make all payments and provide all reports pursuant to Paragraph 4 of the Closed Circuit Television Standard Terms and Conditions, and shall provide Promoter with copies of all reports received from sublicensed outlets. You shall distribute to Promoter all amounts due for exhibition rights to the Event, with no deduction, set-offs or holdbacks whatsoever.

b.    In addition to the reports required in the Closed Circuit Television Standard Terms and Conditions, you shall provide Promoter with:

Separate reports no later than 72 hours, 48 hours, and 24 hours before each Event and one week following the Event, including the name, locations and license fee for each closed circuit exhibition outlet and including method of signal delivery to each outlet and the information required in Paragraph 10(d) of the Closed Circuit Television Standard Terms and Conditions.

Promoter's representatives shall have the right to visit your offices and each outlet at any time during normal business hours prior to an Event and after an Event to obtain and verify such information, in person or electronically, and to make arrangements for the payment of all license fees due to Promoter promptly following the Event.

All contracts and reports shall be sent to:

Thomas G. Brown
PBC on PPV, LLC
13273 Ventura Boulevard, Suite #208
Studio City, California 91604-1840

12.    **Confidentiality.** Neither party shall disclose to any third party (other than its employees and agents, in their capacity as such, on a need-to-need basis), any information with respect to the terms and provisions of this Agreement except: (i) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction, in which event the party making disclosure shall so notify the other party as promptly as practicable (if possible, prior to making such a disclosure), (ii) as part of normal reporting or review procedure to its banks, auditors and attorneys and similar professionals, provided that such banks, auditors, attorneys and similar professionals agree to be bound by the provisions of this paragraph, and (iii) in order to enforce its rights pursuant to this Agreement.

13.    **Entire Agreement.** This Agreement supersedes and terminates all prior agreements between the parties hereto and their affiliates with respect to the subject matter contained herein, and this Agreement embodies the entire understanding between the parties relating to such subject matter, and any and all prior correspondence, conversations and memoranda are merged herein and shall be without effect hereon. This Agreement may not be altered, amended or discharged, except by a subsequent writing signed by the parties hereto. This agreement may be executed in counterparts, all of which shall constitute one and the same agreement.    Signatures exchanged by electronic means shall be considered as original for all purposes. The laws of the State of California applicable to contracts executed and to be fully performed in the State of California shall govern this agreement, and execution of the agreement shall constitute the consent of Licensee and any sublicensee to exclusive jurisdiction of California. Any dispute, controversy or claim arising out of or relating to this Agreement, including the formation, interpretation, breach or termination thereof, including whether the claims asserted are arbitrable, will be referred to and finally determined by arbitration in accordance with the JAMS Commercial Arbitration Rules before a single arbitrator who shall be selected by the parties to the arbitration and who shall be a retired judge or justice. If the parties are unable to select an arbitrator, the arbitrator will be selected in accordance with the JAMS Rules. The place of arbitration will be Los Angeles, California. The prevailing party in arbitration shall be

*(Remainder of this page intentionally left blank.)*

7

entitled to its reasonable costs, including the costs of arbitration and attorneys' fees. Judgment upon the award rendered by the arbitrator may be enforced in any state or federal court of competent jurisdiction.

Very truly yours,

PBC on PPV, Inc

By: _____

Thomas G. Brown

Please confirm your agreement with the above by signing and returning the attached copy of this letter. This Closed-Circuit License Agreement Shall not become effective unless and until Promoter has accepted and signed this Agreement and returned one copy to you.

ACCEPTED AND AGREED:

G&G Closed Circuit Events, LLC.

By: _____

Nicolas J. Gagliardi, President

BY SIGNING THIS AGREEMENT, LICENSEE ACKNOWLEDGES HAVING READ THE CLOSED CIRCUIT TELEVISON STANDARD TERMS AND CONDITIONS AND CONFIRMS ITS AGREEMENT THERETO. NO CHANGES ARE AUTHORIZED IN THE CLOSED CIRCUIT TELEVISON STANDARD TERMS AND CONDITIONS.

8



**CLOSED CIRCUIT EVENTS**

Rate Card for May 28, 202 PPV Davis vs. Romero Lightweight World Championship

Capacity                    Pricing
------------                ----------

1 to 100                    $600 / $610.50 for TX

101 to 200                  $1,000 / $1,022.50 for TX

201 to 300                  $1,400 / $1,434.50 for TX

301 to 400                  $1,800 / $1,846.50 for TX

401 to 500                  $2,200 / $2,260 for TX

- Activation Fee of $150 and $100 S&H is included
- Texas locations must add 3% State tax
- Casinos to handled by Guy Laughridge and priced on a location by location basis